```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
```
───────────────────────────────

```
JERRI K. ALIANELL,

                         Plaintiff,
         -vs-                                  No. 6:15-CV-06036 (MAT)
                                               DECISION AND ORDER
CAROLYN W. COLVIN, ACTING
 COMMISSIONER OF SOCIAL SECURITY,
                         Defendant.
```
───────────────────────────────

**I.   Introduction**

Represented by counsel, Jerri K. Alianell ("plaintiff") brings this action pursuant to Titles II and XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons discussed below, plaintiff's motion is granted to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order.

**II.  Procedural History**

The record reveals that in September 2011, plaintiff (d/o/b September 9, 1985) applied for DIB and SSI, alleging disability as of March 15, 2010. After her application was denied, plaintiff

requested a hearing, which was held before administrative law judge David S. Pang ("the ALJ") on February 12, 2013. The ALJ issued an unfavorable decision on August 23, 2013. The Appeals Council denied review of that decision and this timely action followed.

### III. Summary of the Evidence

#### A. Medical Evidence

The medical record reveals that plaintiff suffered from various diagnoses, including fibromyalgia, back pain, polycystic ovary disease, obesity, insomnia, and depression. Plaintiff treated with Dr. Clifford Hurley beginning in November 2010. Treatment notes through December 2012 indicate that plaintiff saw Dr. Hurley for primary care and medication management. These notes do not contain detailed findings of physical examinations, although the notes reflect that Dr. Hurley diagnosed plaintiff with fibromyalgia. His treatment notes also reflect that plaintiff's morbid obesity was considered serious, and in a June 2011 note, Dr. Hurley opined that it was "half of her problem." T. 452.

At plaintiff's second appointment in December 2010, Dr. Hurley noted that plaintiff complained of "generalized aches and pains all over." T. 620. He later stated that he prescribed her Elavil/Amitriptyline which "[h]opefully [would] help with the aches and pains and the fibromyalgia as well." Id. Later that month, Dr. Hurley recorded that he "[thought] that [plaintiff] was . . . dealing with . . . fibromyalgia," stating that she was "dealing

with a lot of the pain issues and she [was] still having some vague issues with pain in terms of joint pain and things like that." T. 621. The record does not reveal any results of Dr. Hurley's physical examinations through that time period. August 2011 X-rays of plaintiff's thoracic and lumbosacral spine were negative for any abnormalities. A left foot X-ray taken later that month was normal.

In January 2012, Dr. Hurley noted that plaintiff's psychological medications, which included Abilify and Cymbalta, were causing "a lot of issues as far as sedation." T. 447. Throughout that year, Dr. Hurley's chart notes indicate that plaintiff treated with him primarily for medication management, but again do not note findings of physical examinations, if any were performed. In late December 2012, plaintiff appeared "basically looking for more pain meds," and reporting "having all kinds of problems." T. 652. She also reported attempting to lose weight in order to qualify for gastric bypass surgery.

A sleep study performed in November 2011 indicated decreased REM sleep and prolonged REM sleep latency, but did not demonstrate obstructive sleep apnea. The results were consistent with "mild to moderate excessive daytime sleepiness." T. 351. Dr. Michael Yurcheshen, in interpreting the sleep study, stated that he was "suspicious that her multiple medications could be leading to daytime sedation," but noted that depression or fibromyalgia could contribute to fatigue. T. 358. He also diagnosed chronic insomnia.

3

He instructed plaintiff to keep a regular bedtime and keep a sleep log.

Treatment notes from Dr. Joanne Wu at Unity Spine Center indicate that in September 2011, plaintiff's spine was positive for posterior tenderness; she exhibited moderate to severe paraspinal muscle spasms; bilateral sacroiliac sulci tenderness with paraspinal muscle spasms and gluteal spasms; negative straight leg raise ("SLR"); bilateral trochanteric region tenderness; and intact balance and gait. Plaintiff was taking more than ten various medications. She was noted to weigh 286 pounds with a height of five feet, two inches.

In November 2012, plaintiff reported to Dr. Wu that her condition was "about the same" except that her sleep had improved taking Trazodone. T. 338. On physical examination, she exhibited posterior tenderness of the spine; bilateral sacroiliac tenderness; some midline tenderness with paraspinal tenderpoints and "absent trigger points."[1] T. 340. Otherwise, her examination was essentially normal. Dr. Wu assessed plaintiff as a patient with "central pain complicated by obesity." T. 340.

Plaintiff saw Dr. Wu in March 2012, reporting again that her condition was "about the same." T. 504. It was noted that she had failed to appear for five physical therapy appointments, and

---

[1] Fibromyalgia pain is often associated with tenderness in at least 11 of the 18 "tender" or "trigger" points. See SSR 12-2p, Titles II & XVI: Evaluation of Fibromyalgia (S.S.A. July 25, 2012).

4

reported that "major depression [was] a barrier." Id. Her weight had increased to 306 pounds, for a body mass index ("BMI") of 54.2. Physical examination findings, if any, were not recorded.

In April 2012, plaintiff treated with Dr. John Klibanoff, who noted that plaintiff had limited range of motion in the knees and reported pain. Physical examination showed mild crepitation in the right greater than the left, and "some limited mobilization" medically bilateral. In May 2012, Dr. Klibanoff noted that plaintiff reported "pain, joint stiffness, and weakness," but did not note any objective physical findings. T. 555. In June 2012, Dr. Klibanoff noted "patellofemoral crepitation and mild discomfort," as well as pain in the knees. T. 558. Plaintiff was administered injections for knee pain. Later that month, plaintiff reported improvement in her knee pain, and Dr. Klibanoff noted that multiple X-rays of the foot and ankle showed no evidence of fracture, sublaxation, or dislocation.

Medical records from Greece Obstetrics and Gynecology indicate that plaintiff was diagnosed with polycystic ovary syndrome ("PCOS"). Imaging tests revealed a unilocular cyst on her left ovary. Plaintiff reported "left lower quadrant discomfort" associated with the condition, T. 258, and in July 2011 she had an intrauterine device removed. T. 271. At her hearing, plaintiff testified that her PCOS caused her pain "once every couple of months." T. 15.

5

Mental health treatment notes from Unity Mental Health, spanning February 2011 through October 2012, indicate a diagnosis of major depressive disorder. On mental status examination, plaintiff was consistently assessed as unremarkable, with logical and coherent thought process and good judgment and insight. The only abnormal findings involved plaintiff's mood, which was often noted as anxious or depressed; and her thought processes, which were occasionally noted as reflecting feelings of guilt, helplessness, or worthlessness. The latest treatment note, dated October 2012, stated that plaintiff reported "doing better and feel[ing] stable on her current [medications]"; it was further noted that plaintiff "appear[ed] to be in the maintenance phase of treatment and require[d] ongoing medication management to meet identified goals." T. 603. Treatment notes from psychiatrist Nusrat Shafiq, spanning February 2011 through January 2012, recorded similar MSE findings.

B.  **Treating Source Opinions**

In January 2012, Dr. Hurley completed a fibromyalgia residual functional capacity ("RFC") assessment. He opined that plaintiff suffered from multiple tender points, nonrestorative sleep, chronic fatigue, numbness and tingling, dysmenorrhea, anxiety, depression, and chronic fatigue syndrome. According to Dr. Hurley, plaintiff's pain was located bilaterally in the lumbosacral spine, thoracic spine, and knees/ankles/feet. Dr. Hurley opined that plaintiff was

6

capable of low stress jobs and could tolerate moderate stress. She could sit for up to 30 minutes at one time; stand for 20 to 30 minutes at one time; and sit, stand, and/or walk for less than 2 hours in an in an eight-hour workday. She could occasionally lift ten pounds or less; occasionally twist but rarely or never stoop, crouch, or climb ladders or stairs; and had significant limitations in reaching, handling, and fingering. She would have to be absent from work for about two days per month.

In May and September 2012, Dr. Hurley completed physical assessments for determination of employability. He opined that plaintiff could stand or walk one to two hours per eight-hour workday; sit for two to four hours per eight-hour workday; and lift or carry for one to two hours per eight-hour workday.

In January 2013, Dr. Hurley completed a physical RFC questionnaire, opining that plaintiff could sit for about 30 minutes at a time; stand for about 30 minutes at a time; and sit, stand, and/or walk for less than two hours in an in an eight-hour workday. He opined that plaintiff could frequently lift ten pounds or less; frequently look down, turn head right or left, look up, and hold her head in a static position; frequently twist; occasionally stoop; rarely climb stairs; and never crouch, squat, or climb ladders. According to Dr. Hurley, plaintiff's impairments would cause her to miss about four days per month of work.

Also in January 2013, Dr. Klibanoff completed a physical RFC questionnaire. He opined that plaintiff could walk less than one city block; sit for 30 minutes at a time; stand for 30 minutes at a time; sit for four hours per eight-hour workday; stand and/or walk for less than two hours per eight-hour workday; never lift ten pounds; and rarely lift less than 10 pounds.

### C. Consulting Opinions

In December 2011, Dr. Kavitha Finnity completed a psychiatric evaluation at the request of the state agency. Plaintiff reported having past visits to the ER for treatment of anxiety, but no hospitalizations. She reported being in treatment at Unity every two weeks "for psychotherapy" and every for to six weeks with Dr. Shafiq "for medication." T. 372. On MSE, plaintiff appeared depressed but findings were otherwise normal. Dr. Finnity opined that plaintiff could "follow and understand simple directions, perform simple tasks," "maintain attention and concentration and a regular schedule," "learn new tasks and perform complex tasks," and "make appropriate decisions." T. 374. According to Dr. Finnity, plaintiff "was having difficulty relating with others and dealing with stress." T. 374.

Dr. Karl Eurenius performed a consulting orthopedic examination. On physical examination, plaintiff demonstrated difficulty squatting due to back pain and limited range of motion of the thoracic and lumbar spine with positive SLR. Her exam was

otherwise essentially normal, and it was noted that there were no trigger points in her cervical spine. Dr. Eurenius opined that plaintiff had "some" limitations in "prolonged sitting, prolonged standing, bending, lifting, or carrying due to chronic low back pain with neuropathic symptoms." T. 378-79. A lumbosacral X-ray performed in association with Dr. Eurenius's exam was negative for any abnormal findings.

**IV. The ALJ's Decision**

The ALJ followed the well-established five-step sequential evaluation promulgated by the Commissioner for adjudicating disability claims. See 20 C.F.R. § 404.1520. Initially, the ALJ found that plaintiff met the insured status requirements of the Social Security Act through June 30, 2014. At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since March 15, 2010, the alleged onset date. At step two, the ALJ found that plaintiff suffered from the following severe impairments: fibromyalgia, low back pain, bilateral knee oseteoarthritis, polycystic ovarian disease, insomnia/daytime sleepiness, hypertension, diabetes, gastritis/reflux, morbid obesity, depression, and anxiety. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. The ALJ found that plaintiff had mild restrictions in activities of daily living

("ADLs"), and moderate restrictions in social functioning and concentration, persistence, or pace.

Before proceeding to step four, the ALJ determined that plaintiff retained the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except that plaintiff could only occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally stoop, kneel, crouch, and craw; would require a sit stand option, where plaintiff would have the option to change position every half hour, however, "when changing position, she would not have to move away from the workstation so she would not be off task"; and plaintiff would be limited to simple tasks with only occasional interaction with supervisors, co-workers, and the public. T. 43. In coming to his RFC determination, the ALJ considered the effects of plaintiff's obesity, concluding that the condition could cause "additional hardship" in standing, walking, lifting, carrying, climbing, stooping, crouching, kneeling, and crawling.

After finding that plaintiff could not perform any past relevant work, the ALJ found that considering plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy which plaintiff could perform. Accordingly, he found that she was not disabled.

**V.   Discussion**

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error. 42 U.S.C. § 405(g); see also Green-Younger v. Barnhard, 335 F.3d 99, 105-06 (2d Cir. 2003). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

**A.   Treating Physician's Opinions**

Plaintiff contends that the ALJ erred in affording less than controlling weight to the opinions of treating physician Dr. Hurley. More specifically, plaintiff argues that the ALJ should have attempted to clarify Dr. Hurley's opinions rather than simply discredit Dr. Hurley's assessment, particularly as to Dr. Hurley's opinion that plaintiff suffered from fibromyalgia. The Court agrees that the ALJ did not properly evaluate Dr. Hurley's treating source opinions.

In giving little weight to Dr. Hurley's opinion that plaintiff suffered from fibromyalgia resulting in significant limitations, the ALJ reasoned that this assessment was inconsistent with substantial record evidence, including Dr. Hurley's own treatment findings and plaintiff's "reported full activities of daily living." T. 49. In support of his reasoning that Dr. Hurley's

11

opinions were inconsistent with his own findings, however, the ALJ cited findings from Dr. Wu, not Dr. Hurley. The ALJ concluded that these findings "indicated normal hips, pelvis and lumbar spine." As described above, plaintiff saw Dr. Wu on three occasions which appear in the record, and only two of these notes indicate physical exam findings. Those findings revealed posterior tenderness in the spine, moderate to severe paraspinal muscle spasms, bilateral sacroiliac sulci tenderness with paraspinal muscle spasms, gluteal spasms, bilateral trochanteric region tenderness, and midline tenderness with paraspinal tenderpoints but no trigger point tenderness. With the possible exception of the notation of no trigger point tenderness, these notes are not inconsistent with Dr. Hurley's opinions. Indeed, Dr. Wu diagnosed plaintiff primarily with "central pain complicated by obesity," a finding which was consistent with Dr. Hurley's opinions. T. 340.

Dr. Hurley's own treatment notes, contrary to the ALJ's conclusion, also are not inconsistent with his opinions. His treatment notes do not contain any objective findings whatsoever, instead consisting of narrative summaries of his treatment of plaintiff. The notes consistently stated that plaintiff reported pain and recorded a diagnosis of fibromyalgia. On this record, it is apparent that the ALJ erred in finding that Dr. Hurley's opinions were *inconsistent* with the substantial evidence of record. See Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (noting that

treating physician's opinion "will not be deemed controlling" "[w]hen other substantial evidence in the record *conflicts* with" that opinion) (emphasis added). Rather, the record simply did not contain sufficient evidence from which to conclude that Dr. Hurley's opinion was supported by "well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with other substantial evidence in the record." Id.

The ALJ specifically stated that he "[found] very little medical evidence or specific evaluation to support [a finding that plaintiff's fibromyalgia was] disabling." T. 46. The ALJ reasoned that during plaintiff's visits to Dr. Wu, "there [were] no exam findings suggesting multiple tender points, muscle weakness, swelling, or numbness/tingling." T. 46. The ALJ neglected to consider, however, that no findings in the record, other than one isolated treatment note from Dr. Wu noting "absent trigger points," actually found to the contrary. Moreover, Dr. Hurley's treatment notes and opinions indicate that he considered plaintiff to suffer from disabling fibromyalgia, and in fact, he noted in his January 2012 opinion that plaintiff did suffer from criteria necessary to satisfy a fibromyalgia, including trigger point tenderness. "The ALJ cannot rely on the *absence* of evidence, and is thus under an affirmative duty to fill any gaps in the record." Rosado v. Barnhart, 290 F. Supp. 2d 431, 440 (S.D.N.Y. 2003) (emphasis added). Here, although the record does contain a great deal of

medical evidence, there was insufficient evidence for the ALJ to reject Dr. Hurley's opinion. See Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte.").

SSR 12-2P specifically discusses the assessment of fibromyalgia. The ruling outlines two sets of diagnostic criteria for diagnosing fibromyalgia, based on standards from the 1990 ACR Criteria for the Classification of Fibromyalgia or the 2010 ACR Preliminary Diagnostic Criteria. The ruling states that when there is insufficient evidence to conclude that a claimant suffers from a medically determinable impairment of fibromyalgia or is disabled as a result of such medically determinable impairment, the agency has several options to take in an attempt to resolve the insufficiency, including recontacting the treating physician, requesting additional records, and ordering a consulting examination to assess the severity and functional effects of medically determined fibromyalgia.

Here, although the ALJ found that fibromyalgia was a medically determinable impairment, he rejected the treating physician's conclusion that the condition was disabling. Considering this record, which contained insufficient evidence to determine whether Dr. Hurley's opinion was supported by medically acceptable clinical and diagnostic techniques, the ALJ's failure to follow the

procedures described in SSR 12-2P was error. Remand is thus required. See <u>Wiley v. Comm'r of Soc. Sec.</u>, 2015 WL 9684924, *7 (N.D.N.Y. Dec. 7, 2015), report and recommendation adopted, 2016 WL 109993 (N.D.N.Y. Jan. 8, 2016) (remanding "for a proper evaluation of Plaintiff's symptoms in light of her fibromyalgia in accordance with SSR 12-2p"); see generally <u>Schmelzle v. Colvin</u>, 2013 WL 3327975 *14 (N.D.N.Y. July 2, 2013) (holding that remand to the Commissioner for further development of the evidence is appropriate "unless there is conclusive evidence of disability and no apparent basis to conclude that a more complete record might support the Commissioner's decision").

Additionally, the ALJ failed to give "good reasons" for rejecting Dr. Hurley's opinions, because as discussed above the opinions were actually not inconsistent with Dr. Hurley's own treatment notes or with other substantial evidence in the record.[2] Under these circumstances, the ALJ erred in failing to seek further clarification from Dr. Hurley as to whether sufficient medical evidence existed supporting his opinion that plaintiff's

---

[2] The Court also notes that the ALJ's citation to plaintiff's "reported full activities of living" was not a good reason, as plaintiff's reports of her daily activities, most of which she reported she could only do with frequent breaks, hardly established an ability to work under full-time conditions. See, e.g., <u>Miller v. Colvin</u>, No. 2015 WL 4892618, *5 (W.D.N.Y. Aug. 17, 2015) (finding ALJ's citation to plaintiff's activities of daily living was not a good reason where the ALJ "did not explain how the performance of these limited activities of daily living translates into the ability to perform substantial gainful work at all exertional levels in a typical competitive workplace environment.").

fibromyalgia, in combination with her other medically determinable impairments, resulted in disabling limitations. See Mnich v. Colvin, 2015 WL 7769236, *19 (N.D.N.Y. Sept. 8, 2015), report and recommendation adopted, 2015 WL 7776924 (N.D.N.Y. Dec. 2, 2015) (remanding "so that the ALJ may recontact [the treating physician] or assess the medical evidence with the understanding that fibromyalgia does not always result in objective findings or diagnostic tests"); Algarin v. Barnhart, 2007 WL 528889, *5 (W.D.N.Y. Jan. 25, 2007) ("[I]f the ALJ had doubts or questions about the fibromyalgia diagnosis, he should have attempted, in the first instance, to develop the record further by seeking clarification from [treating sources].").

On remand, the ALJ is directed to recontact Dr. Hurley for clarification of his opinion. The ALJ should seek specific evidence from Dr. Hurley as to whether, and how, the course of his own treatment of plaintiff supported a finding that her fibromyalgia, by itself or in combination with her other medically determinable impairments, resulted in disabling limitations sufficient to meet the criteria described in SSR 12-2P. See SSR 12-2P ("We will find that a person has an MDI of FM if the physician diagnosed FM and provides the evidence we describe in section II.A. or section II.B., and the physician's diagnosis is not inconsistent with the other evidence in the person's case record.").

This clarification may consist of additional treatment notes, or simply a specific explanation from Dr. Hurley, establishing whether medically acceptable clinical and diagnostic techniques supported his opinions. See id. (noting that the Administration "cannot rely upon the physician's diagnosis alone," but must have evidence of treatment which documents that "the physician reviewed the person's medical history and conducted a physical exam," so it can be determined whether the treatment was "consistent with the diagnosis of [fibromyalgia], . . . whether the person's symptoms have improved, worsened, or remained stable over time, and [to] establish the physician's assessment over time of the person's physical strength and functional abilities.").

These instructions on remand should not be interpreted as precluding consideration of plaintiff's other medically determinable impairments, all of which, under the regulations, must be considered in combination with plaintiff's fibromyalgia. See, e.g., Solsbee v. Astrue, 737 F. Supp. 2d 102, 115 (W.D.N.Y. 2010) ("Plaintiff's combination of fibromyalgia, back pain, musculoskeletal impairments, Chron's disease, sleep apnea, and obesity caused disabling pain and limitations which impeded Plaintiff's ability to work.").[3]

---

[3] As described in SSR 12-2p, both sets of diagnostic criteria include, as an essential criterion, a requirement that other disorders which could cause the symptoms of fibromyalgia were excluded. This requirement applies to diagnosis of fibromyalgia as a medically determinable impairment, and not to assessment of limitations stemming from fibromyalgia. As such, it is distinct from the Commissioner's evaluation of disability, which necessarily focuses on a

**B.     RFC**

Plaintiff contends that the ALJ's RFC finding was unsupported by substantial evidence. Specifically, plaintiff argues that Dr. Eurenius's opinion, which stated that plaintiff had "some" limitations in "prolonged sitting, prolonged standing, bending, lifting, or carrying due to chronic low back pain with neuropathic symptoms," was too vague to be relied upon in supporting an RFC to perform light work. T. 378-79. The Court disagrees that, in this particular case, the use of the phrase "some limitations" was impermissibly vague. "Although an expert opinion may describe a claimant's impairments in terms that are so vague as to render the opinion useless, see Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013), the use of vague phrases by a consultative examiner does not automatically render an opinion impermissibly vague." Johnson v. Colvin, 2015 WL 1300017, *12 (W.D.N.Y. Mar. 24, 2015) (citing Rosenbauer v. Astrue, 2014 WL 4187210, *16 (W.D.N.Y. 2014) (collecting cases)). Here, like in Johnson, Dr. Eurenius's opinion was supported by a thorough report which described Dr. Eurenius's findings upon physical examination.

In any event, upon remand the ALJ must fully reevaluate plaintiff's RFC in light of the newly developed record as a whole.

---

plaintiff's limitations resulting from *all* medically determinable impairments in combination. See Lasitter v. Astrue, 2013 WL 364513, *9 (D. Vt. Jan. 30, 2013) ("SSR 12-2p does not do away with the requirement that, once the ALJ finds that the claimant had fibromyalgia, he must determine whether that fibromyalgia, alone or in combination with other impairments, was disabling.").

In addition to seeking the evidence described above from Dr. Hurley, the ALJ may also seek, as he deems necessary, additional records, a consultative exam, or any other opinion evidence he may find helpful in formulating an RFC determination.

### C.   Consideration to Stress-Related Limitations

Finally, plaintiff contends that the ALJ erred in failing to fully account for her limitations regarding stress. As noted above, consulting examiner Dr. Finnity stated that plaintiff "was having difficulty relating with others and dealing with stress." T. 374. This statement did not specifically state that plaintiff had work-related limitations stemming from stress. The record also includes a statement from Dr. Hurley, in which he opined that plaintiff was capable of low stress jobs and could tolerate moderate stress.

Ample notes of mental status examinations revealed no significant abnormal findings. According to mental health treatment notes, plaintiff's mental health condition had improved and she was stable on medications as of as of October 2012, approximately ten months after Dr. Finnity's examination. Under these circumstances, the ALJ's RFC finding that plaintiff could perform work "with only occasional interaction with supervisors, co-workers, and the public" adequately accounted for any stress-related limitations. See, e.g, Steffens v. Colvin, 2015 WL 9217058, *4 (W.D.N.Y. Dec. 16, 2015) (citing Kotasek v. Comm'r of Soc. Sec., 2009 WL 1584658, *13 (June 3, 2009) (ALJ's RFC finding, which limited

contact with other individuals, was supported by substantial evidence where medical opinions indicated that plaintiff had stress stemming from social phobias)).

## VI. Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Doc. 16) is denied and plaintiff's motion (Doc. 11) is granted to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order. The Clerk of the Court is directed to close this case.

**ALL OF THE ABOVE IS SO ORDERED.**

                                              **S/Michael A. Telesca**
                                              HON. MICHAEL A. TELESCA
                                              United States District Judge

Dated:    February 5, 2016
             Rochester, New York.